[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY
This matter concerns an application for a prejudgment remedy in the amount of $125,000. The plaintiff alleges that on September 11, 1996, the plaintiff entered into a written contract or authorization with the defendant to lease real estate owned by the defendant in Derby. The contract is alleged to have complied with the provisions of § 20-325 (a) of the General Statutes and provided that the defendant agreed to pay the plaintiff a commission if the plaintiff procured a customer willing to lease the property while the contract was in effect.
The complaint goes on to allege that, through a duly licensed salesman employed by the plaintiff, the property was brought to the attention of Marc Glassman, Inc., doing business as Xpect Drugs which eventually agreed to lease the property. Pursuant to the commission schedule set forth in the contract, the plaintiff claims it is entitled to a commission of $119,149.80 and now CT Page 4962 seeks a prejudgment remedy in the amount of $125,000 based on the fact it also seeks attorney's fees and makes a claim for interest.
1.
The plaintiff on June 17, 1997 filed a claim or a real estate broker's lien in accordance with § 20-325 (a) of the General Statutes. The lien was in the amount of $119,149.80 which lien was duly recorded in the Land Records of Derby.
The defendant claims that the plaintiff's present request for an attachment under § 52-278 (d) is inappropriate because there is already a broker's lien on the same property. But the plaintiff argues it is entitled to a prejudgment remedy in addition to the broker's lien. Section 52-278a(d) defines "prejudgment remedy" in such a way as to make is available in all "civil actions." The only situations where such a remedy is not available appear to be set forth in § 52-278 (b) and "broker's liens" are not mentioned in that statutory subsection. The statute authorizing broker's liens (§ 20-325 (a)) does not reference § 52-278 (d) or otherwise define the broker's lien as an exclusive prejudgment remedy.
But certainly a court should take into account any security a plaintiff already has in determining whether a prejudgment remedy should be granted or in deciding upon the amount of that remedy. See cases cited by defendant, Blakeslee v. E.I. Constructors,Inc., 32 Conn. App. 118 (1993); People's Bank v. Bilmor Bldg.Corp., 28 Conn. App. 809 (1992); also see Bank of Boston v.Schlesinger, 220 Conn. 152 (1991). It would be an odd twist to a statutory scheme purporting to take into account due process concerns for a hearing mechanism to be set up to meet those concerns only to permit attachments to be placed on people's property unrelated to and far exceeding any need a plaintiff might have to protect its interests. Such a cavalier system would violate fundamental due process rights since an attachment deprives a person of the effective use of his or her property and certainly the state cannot permit this to happen where there is no real need to do so in order to protect a claimant's interest. Thus, in a case like Blakeslee, the court said at page 131:
 "In cases where some security exists for the payment of the debt, however, as in mortgage foreclosure actions, the question for a trial court is enlarged. In such cases, the CT Page 4963 court not only must determine what the amount of the judgment will probably be, but what additional security, beyond the security the plaintiff has already, will be necessary to equal that probable judgment. See People's Bank v. Bilmor Building Corporation, supra. A plaintiff is not required to exhaust the collateral securing a debt before it attempts to reach other assets of a defendant by way of attachment, but the collateral must be taken into account in establishing the amount of the attachment necessary as a supplement. Bank of Boston Connecticut v. Schlesinger, supra. Thus, a plaintiff may be entitled to a prejudgment remedy because it has demonstrated the requisite probable cause, but it may still be denied the remedy if its interest is already adequately secured."
Later in this opinion the court will discuss the issue of whether there is any equity in the property upon which the broker's lien was placed and on which the plaintiff now seeks an attachment and the effect of that consideration on the plaintiff's request for an attachment. But assuming such equity exists in this property, if there is already a broker's lien on this proper y in the amount of $119,049.80, it would be difficult to understand why a § 52-278 (d) lien is necessary to protect any interest of the plaintiff. If this lien were to be in effect added to the broker's lien, the property would appear to be unnecessarily encumbered.
The problem with adopting this position is this case, however, is that the court concludes that the proposed security given to the plaintiff by the § 20-325 (a) broker's lien appears to be a nullity because the lien appears to be defective and subject to attack. Subsection (b)(6) of that statute requires that a broker's contract must explicitly include language that a broker's lien can be put on the property under subsection (d) of the statute for services rendered. In this agreement, such language appears in section J(8) of the agreement. But paragraph E which purports to incorporate and references section J is crossed out and the cross out is initialed by both parties so that adequate statutory notice of the right to place a broker's lien cannot be found to have been given. Although, in the court's opinion, this does not invalidate the whole contract, it does throw into serious question and should effectively invalidate any right the plaintiff might have to place and thus enforce the broker's lien actually put on the property. Section 20-235 (a)(d) permits a lien to be placed on property without the ordinary CT Page 4964 protections afforded in § 52-378 (d) attachments — such a statutory scheme would require adequate notice which this agreement does not give.
The court concludes the plaintiff has the right to request an attachment on this property pursuant to § 52-278 (d) of the General Statutes. The question now becomes whether, under the appropriate probable cause standards, such an attachment is warranted and, if so, what amount should it be set at. The court will now discuss these matters, first dealing with the merits of the plaintiff's claim.
2.
This agreement appears to be a valid contract, the terms and rate at which the plaintiff is to be compensated are set forth in the agreement. The plaintiff was a duly licensed real estate broker at the time the agreement was entered into; the date the listing agreement was entered into was September 11, 1996, and the contract was to expire in March of 1997.
The day after the contract was signed, Mr. Herzog, a vice president of the plaintiff, wrote to Jim Kelly, an official of Xpect Drugs, regarding the possibility of a lease for the property in question. A plot plan was included in the letter to this individual, the possible construction of an addition to the building was discussed as well as traffic light concerns and the recapture of square footage from another lessee for a total square footage of 36,985 square feet. The agreement itself described the retail store to be leased as containing 20,000 square feet with a plus or minus sign written after that number. At the date the agreement was signed both sides knew more than 20,000 square feet would be needed by Xpect Drugs which is corroborated by the just mentioned letter sent the following day by the plaintiff's vice president, Mr. Herzog, to Mr. Kelly of Xpect Drugs.
Apparently in response to the Herzog letter a secretary of Marc Glassman, Inc., the owning entity of Xpect Drugs, wrote a follow up letter to Mr. Herzog with his own proposals for a lease. Herzog sent a copy of this letter to Mr. Leroy which he described as "an offer to lease."
On November 10, 1996 Mr. Leroy met with representatives of the plaintiff indicating that he wanted to negotiate directly CT Page 4965 with Marc Glassman, Inc. over the Xpect Drug lease. At the meeting, Mr. Leroy was told that Herzog, who had previously negotiated with Marc Glassman, Inc., would not be available to do so and Mr. Caso was to take over Herzog's responsibilities for the plaintiff. Mr. Leroy testified that he felt Mr. Caso was not qualified to negotiate on the defendant's behalf. Why this was so was not made clear by Mr. Leroy.
An internal memo of the plaintiff also indicated that Mr. Leroy wanted to negotiate directly with Marc Glassman, Inc. because there was interest by others in the space and time apparently was of the essence. Mr. Leroy commenced his negotiations and in a December 10, 1996 letter to the plaintiff, Mr. Leroy informed Mr. Herzog that he felt the plaintiff did not negotiate in any way on his behalf after Mr. Herzog gave up his involvement. He stated that he was in the process of negotiating an agreement with Marc Glassman, Inc. himself and did not intend to "honor the commission agreement we signed with Colonial on September 11th."
What should be noted at this juncture, however, is that Mr. Leroy by this letter admits to having entered into an agreement entitling the plaintiff to substantially more compensation than the "finder's fee" he now argues and said in his December 10, 1996 letter was all the plaintiff was entitled to as a result of its efforts. But there is no indication he communicated at the November 10, 1996 meeting his shock at Herzog's prospective absence or Caso's taking over the account. Despite his surprise at Caso taking over the negotiation on November 13, 1996, three days after the November 10 meeting, he felt it necessary to send to Herzog and Caso a copy of a lease proposal he was forwarding to Marc Glassman, Inc. This would not be the type of letter one would sent to a "finder." The point is that Mr. Herzog and his connections brought the defendant in contact with Marc Glassman, Inc. Herzog began preliminary negotiations with that company and if Mr. Leroy, after November 10, then conducted negotiations directly relative to the Xpect Drug lease it was at his request and with apparently a felt obligation on his part to inform the plaintiff as of November 13, 1996 of his efforts to negotiate the lease. Furthermore, if we examine more closely the merits of the defendant's position as to why it claims it is not bound by the September agreement as set forth in Mr. Leroy's December 10, 1996 letter, Leroy states that when he signed the September commission agreement he presumed Herzog had a strong personal relationship with Xpect Drugs which he had since learned Herzog did not have CT Page 4966 and he had presumed Herzog would actively participate in ongoing negotiations with Xpect Drugs.
At no time was it explained to the court why Leroy concluded Herzog did not have an ongoing strong relationship with Xpect Drugs. The "Dear Jim" letter Herzog sent to Mr. Kelly of Xpect Discount the day after the agreement was signed seems to belie this claim as does the fact that even after he commenced direct negotiations with Xpect Drugs on November 10, he felt compelled to send a copy of his November 13 letter to Marc Glassman, Inc. to Herzog and Caso and it was so indicated in the letter the Glassman people were to receive. Nowhere in the September 1996 agreement does the plaintiff identify Mr. Herzog as the exclusive agent for representing the defendant in negotiating with Xpect Drugs and again why copy Caso in the November 13, 1996 letter if he, Mr. Leroy, really believed this was so. Under these circumstances, it would be difficult to understand how the plaintiff could not advance a claim under the September agreement with the commission rates it provided for.
The court will now discuss the appropriate amount of any attachment. The court concludes an attachment in the amount of $125,000 as appropriate as opposed to $66,000 which would be the appropriate amount if a lease of 20,0000 square feet was contemplated. The point is that a "+" and a "-" sign was used after the 20,000 square feet figure mentioned in the agreement. Both sides knew that more than 20,000 square feet would be required by Xpect Drugs. The day after the September agreement in a letter to Kelly of Xpect Discount, Herzog proposed a 36,985 square foot rental; an Xpect Drug official proposed the same square footage in a November 7, 1996 letter to Herzog. The lease was eventually negotiated for 36,106 square feet.
Given the nature of the negotiations that must go on in trying to arrange for commercial leases, obviously some flexibility has to be allowed when broker agreements refer to the actual square footage of the space to be rented. Parties have to accommodate their different needs and preexisting obligations during ongoing negotiations. To say 20,000 plus or minus is not an unfair contract term given these type of contracts and it is not inappropriate to determine the exact size of the commission according to the formula explicitly set out in the agreement based on the square footage actually rented when the deal is finally closed. This can be filled in after the fact and it is commercially appropriate and necessary to do so in light of the CT Page 4967 nature of these contracts and how prospective leases covered by such contracts are negotiated in the real commercial world.
As the plaintiff points out if Xpect Drugs had only rented 10,000 square feet, the plaintiff could not be heard to ask for a commission based on the 20,000 square foot figure.
The court concludes that there is probable cause to sustain the validity of the claim made here and probable cause to conclude that judgment will be rendered for the plaintiff in the amount claimed of $125,000. A prejudgment remedy in that amount is granted.
However, in light of the previous discussion at the beginning of this opinion, the court feels it necessary to make certain further observations. It is unclear to the court what the actual equity is in the Pershing Drive property. Conflicting oral representations were made by counsel and the plaintiff attached to its brief a mortgage document (that was apparently not introduced into evidence) to indicate there is no equity in that property. A motion to disclose assets was filed and apparently counsel have agreed that the plaintiff can submit interrogatories to the defendant in order to discover assets. If assets in addition to the property in the form of bank accounts, et cetera, are discovered and attached pursuant to this ruling, the court does not mean to authorize attachments granting security in excess of $125,000. Therefore, it may be necessary depending on what is disclosed in the discovery process to review the issue of whether there is actually any equity in the Pershing Drive property and whether, depending on that finding, the attachments or their nature must be modified.
Corradino, J.